**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:17cr10**

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| Vs. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| KAYLUN DAITWAN FULLWOOD, | ) | |
| Defendant. | ) | |

**THIS MATTER** is before the Court on Defendant's Motion to Suppress and Request for an Evidentiary Hearing (# 9). The Government filed a Response (# 14) in opposition. On May 9, 2017, the undersigned conducted an evidentiary hearing, heard evidence from the Government and Defendant, and heard arguments from counsel. Defendant then filed an Unopposed Motion to Supplement Evidence for Motion to Suppress (# 19), which the Court granted (# 20). On July 5, 2017, the undersigned heard further testimony and received additional evidence. Having carefully considered the evidence, briefs, and arguments of counsel, the Court enters the following findings, conclusions and recommendation.

**FINDINGS AND CONCLUSIONS**

**I.     Procedural Background**

Defendant is charged in a single-count Bill of Indictment (# 1), which alleges that on or about September 21, 2016, he did knowingly and intentionally possess with intent to distribute a

quantity of cocaine base, more commonly known as "crack cocaine," a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1).[1]

On March 13, 2017, Defendant filed the instant Motion to Suppress (# 9), in which he objects to the results of the search made of his person and his statements made during the September 21, 2016 search and arrest. On April 10, 2017, the Government filed its Response to the motion (# 14). The Court held evidentiary hearings on May 9, 2017 and July 5, 2017.

## II.     Factual Background

### A.     The Government's Evidence

#### 1.     Janelle Henson

Janelle Henson ("Henson"), an assistant clerk for the Buncombe County Clerk of Superior Court's Office, has worked in the Criminal Records Division for twenty-two years and is now a supervisor in Criminal Records. (Hr'g Tr. 4-5, May 9, 2017.) Henson identified Government's Exhibit 1 as a citation that was issued to Defendant in Buncombe County, North Carolina, on February 5, 2016, under file number 16-CR-701540, for the offense of speeding, in violation of N.C.G.S. § 20-141(J1), and operating a vehicle with an expired registration plate, in violation of N.C.G.S. § 20-111(2). (Hr'g Tr. 12-13, 21, May 9, 2017; Gov.'s Ex. 1.) Henson identified Government's Exhibit 2 as a citation that was issued to Defendant, in file number 16-CR-701850, in Buncombe County, North Carolina, on February 12, 2016, for speeding, in violation of N.C.G.S. § 20-141(1). (Hr'g Tr. 14-16, May 9, 2017.) Henson identified Government's Exhibit 3 as a citation issued to Defendant on February 16, 2016, in Buncombe County, North Carolina, under file number 16-IF-702048, for operating a vehicle without a seatbelt, in violation of N.C.G.S. § 20-135.2A. (Hr'g Tr. 16, 44, May 9, 2017; Gov.'s Ex. 3.)

---

[1] The offense involved at least 28 grams of a mixture and substance containing a detectable amount of cocaine base.

Defendant did not appear in court on Government's Exhibits 1, 2, or 3. (Hr'g Tr. 17, 32, 44, May 9, 2017.) When Defendant failed to appear, the office of the Clerk of Superior Court for Buncombe County sent a report to the Department of Motor Vehicles ("DMV"). (Hr'g Tr. 23, 48, May 9, 2017.) On October 19, 2016, Defendant, or someone acting on his behalf, requested that the orders for Defendant's arrest on the called and failed in the files, designated as Government's Exhibits 1, 2, and 3, be stricken and all three cases be reset to November 7, 2016. (Hr'g Tr. 29-30, May 9, 2017.)

### 2. Tracy Davis

Tracy Davis ("Davis"), a Lieutenant with the North Carolina DMV's License and Theft Bureau, has 27 years of experience with the DMV and has access to the DMV's records and database concerning drivers' licenses issued to North Carolina citizens. (Hr'g Tr. 62-63, May 9, 2017.) Each individual who is issued a North Carolina driver's license is given a unique number. (Hr'g Tr. 63, May 9, 2017.) All license holders must provide an address to the DMV for the receipt of correspondence from the agency. (Hr'g Tr. 64, May 9, 2017.)

Lieutenant Davis explained that a driver's license issued by the DMV can be revoked as a result of the failure to appear for a traffic citation. (Hr'g Tr. 65-66, May 9, 2017.) Lieutenant Davis further explained that when an individual fails to appear on a citation, the court sends an electronic transmission to the DMV. (Hr'g Tr. 66, May 9, 2017.) The DMV then sends a letter to the license holder giving them a period of time to show compliance, or the license is suspended until the citation is satisfied. (Hr'g Tr. 67, May 9, 2017.) Once the license has been suspended, the suspension will be accessible to law enforcement officers who are checking on the driving record of a licensee. (Hr'g Tr. 67-68, May 9, 2017.)

Lieutenant Davis identified two letters, both dated May 3, 2016, were sent from the North Carolina DMV to Defendant, informing him that his driver's license would be suspended on July 30, 2016, for failure to comply with Citation Numbers 98830F9 and 094722F8. (Hr'g Tr. 71-73, May 9, 2017; Gov.'s Ex. 56.) These citations appear in Buncombe County court files 16-CR-701540 (Gov.'s Ex. 1) and 16-CR-701850 (Gov.'s Ex. 2). (Hr'g Tr. 76-79, May 9, 2017.) Lieutenant Davis also identified a letter (Gov.'s Ex. 7) sent by DMV to Defendant, dated July 11, 2016, informing Defendant that his driver's license would be suspended on September 9, 2016, for failure to comply with Citation Number 098729F7. (Hr'g Tr. 81-83, May 9, 2017.) This citation is in Buncombe County court file 16-IF-702048. (Gov.'s Ex. 3). All three letters (Gov.'s Exs. 5, 6, 7) were addressed to Defendant at 57 Riverview Drive, Asheville, North Carolina 28806. (Hr'g Tr. 73, May 9, 2017.)

Lieutenant Davis identified Government's Exhibit 8 as a printout of a North Carolina DMV record, which is referred to as "Suspension Record" (Hr'g Tr. 83-84, May 9, 2017; Gov.'s Ex. 8.) Defendant's North Carolina driver's license was suspended/revoked from July 30, 2016 to October 19, 2016. (Hr'g Tr. 102, May 9, 2017.) Defendant sought a reinstatement of his North Carolina driver's license on November 3, 2016, and at that time, Defendant reported that his address was 57 Riverview Road, Asheville, North Carolina 28806. (Hr'g Tr. 90-94, May 9, 2017.)

### 3. Steven Hendricks

Steven Hendricks ("Hendricks"), a Detective employed by the Asheville Police Department, is assigned to the Buncombe County Anticrime Task Force. (Hr'g Tr. 114-115, May 9, 2017.) Detective Hendricks is responsible for investigating drug enforcement in an undercover capacity in Buncombe County, North Carolina. (Hr'g Tr. 115, May 9, 2017.)

At 3:00 p.m. on September 21, 2016, Detective Hendricks was sitting in an unmarked car at the Crossroads Grocery Store, which is located at the corner of Deaverview Road and Pisgah View Road in Buncombe County. (Hr'g Tr. 116, May 9, 2017.) Detective Hendricks was watching a residence on Deaverview Road thought to be associated with drugs. (Hr'g Tr. 116, May 9, 2017.) Other law enforcement officers were in the vicinity. (Hr'g Tr. 116, May 9, 2017.) Detective Hendricks saw Jerald Green ("Green") arrive as a passenger in a vehicle that traveled into the parking lot of the grocery store. (Hr'g Tr. 117-18, May 9, 2017.) Detective Hendricks knew Green from previous investigations. (Hr'g Tr. 118, May 9, 2017.) When the vehicle in which Green was riding as a passenger arrived, it backed into a parking place. (Hr'g Tr. 119, May 9, 2017.)

Detective Hendricks called on his radio to determine if Green was wanted on criminal charges. (Hr'g Tr. 119, May 9, 2017.) Detective Hendricks was advised that there were two outstanding warrants for Green's arrest, and they were based on indictments. (Hr'g Tr. 120, May 9, 2017.) Detective Hendricks witnessed two individuals enter the parking lot and make hand-to-hand transactions with Green. (Hr'g Tr. 120, 127, May 9, 2017.) Detective Hendricks also saw Kaylun Daitwan Fullwood ("Defendant") drive a white sedan into the parking lot and back the vehicle into a parking spot next to the car that Green was riding in as a passenger. (Hr'g Tr. 120-21, May 9, 2017.) Detective Hendricks knew Defendant and inquired of other officers if there were outstanding warrants for Defendant's arrest. (Hr'g Tr. 124, May 9, 2017.) Detective Hendricks was informed that Defendant's driver's license was suspended. (Hr'g Tr. 124, May 9, 2017.)

Detective Hendricks radioed the other officers that he had observed Defendant operating a vehicle. (Hr'g Tr. 124, May 9, 2017.) Shortly thereafter, a third vehicle pulled into the parking lot and parked next to the vehicle Defendant was driving. (Hr'g Tr. 124, May 9, 2017.) An individual

got out of the passenger side of the vehicle that had arrived last and entered as a passenger in the vehicle Defendant was operating. (Hr'g Tr. 124-25, 128, May 9, 2017.) Detective Hendricks radioed other law enforcement officers to come to the parking lot. (Hr'g Tr. 125, May 9, 2017.)

When the other officers arrived, the third individual who was in Defendant's vehicle ran while the officers chased him on foot. (Hr'g Tr. 126, 128, May 9, 2017.) The officers then approached Defendant because he was driving a vehicle with a suspended license. (Hr'g Tr. 127-28, May 9, 2017.)

### 4. Jason Lambert

Jason Lambert ("Lambert"), a Deputy Sheriff with the Buncombe County Sheriff's Office for the last five years, has worked a total of twelve years in law enforcement. (Hr'g Tr. 129-130, May 9, 2017.) On September 21, 2016, between 3:00 p.m. and 4:00 p.m., Deputy Lambert was assisting with a drug investigation and was stationed on Pisgah View Road in a marked patrol car. (Hr'g Tr. 130, May 9, 2017.) While in his patrol vehicle, Deputy Lambert heard Detective Hendricks ask for a warrant check on Green. (Hr'g Tr. 131, May 9, 2017.) Deputy Lambert then pulled up Green's file on his mobile data terminal in the patrol car. (Hr'g Tr. 131, May 9, 2017.) The terminal showed two outstanding warrants for Green's arrest. (Hr'g Tr. 131, May 9, 2017.) Deputy Lambert called Detective Hendricks on his radio and informed him about the outstanding arrest warrants. (Hr'g Tr. 131, May 9, 2017.) Deputy Lambert heard on his radio that Defendant had pulled into the parking lot, but Deputy Lambert did not perform any checks for warrants for Defendant's arrest. (Hr'g Tr. 131, May 9, 2017.)

### 5. Nathan Ball

Nathan Ball ("Ball"), employed as a Buncombe County Sheriff's Deputy, has been employed as a law enforcement officer since 2004. (Hr'g Tr. 142-43, May 9, 2017.) On September

21, 2016, Deputy Ball was working with the "SCET Team" and assisting in an ongoing investigation. (Hr'g Tr. 143, May 9, 2017.) Deputy Ball was riding in a marked patrol vehicle with Deputy Roger Warren ("Warren"), a K-9 officer. (Hr'g Tr. 143-44, May 9, 2017.). Deputy Warren's vehicle was equipped with a computer allowing access so that inquiries could be made concerning the status of drivers' licenses and license plates. (Hr'g Tr. 144, May 9, 2017.)

While Deputy Ball and Deputy Warren were traveling to the Crossroads Grocery Store, Deputy Ball heard Deputy Lambert state on the radio that there was an outstanding warrant for Green's arrest. (Hr'g Tr. 146, May 9, 2017.) Deputy Ball then heard Deputy Hendricks state on the radio that Defendant had pulled into the parking lot of the Crossroads Grocery Store as the driver of a vehicle. (Hr'g Tr. 147, May 9, 2017.) Deputy Ball was aware that Defendant was serving a term of federal probation for a weapons offense, and Defendant had previously been involved in a shooting incident at Erwin High School. (Hr'g Tr. 148, May 9, 2017.) Detective Hendricks asked over the radio for someone to determine if there were any outstanding warrants for Defendant's arrest. (Hr'g Tr. 148, May 9, 2017.) Deputy Ball used the computer to search and found that there were no outstanding warrants, but he learned Defendant's driver's license was suspended and revoked. (Hr'g Tr. 148-151, May 9, 2017.) Deputy Ball used the radio to provide this information to Detective Hendricks. (Hr'g Tr. 151, 175, May 9, 2017.)

A short time later, Deputies Warren and Ball arrived at the Crossroads Grocery Store parking lot. (Hr'g Tr. 153, May 9, 2017.) Deputy Ball knew the reputation of the area as being a place where drug transactions and acts of violence take place. (Hr'g Tr. 152-53, May 9, 2017.)

When Deputies Ball and Warren arrived at the parking lot, Deputy Ball saw two vehicles backed into the parking lot. (Hr'g Tr. 153, May 9, 2017.) One of the vehicles was red, and the other vehicle was white. (Hr'g Tr. 153, May 9, 2017.) A black vehicle also entered the parking

7

lot. (Hr'g Tr. 153, May 9, 2017.) Deputy Warren positioned his vehicle in front of both the red vehicle and the white vehicle. (Hr'g Tr. 153, May 9, 2017.) Deputy Ball got out of his patrol car and went to the driver's side door of the red vehicle. (Hr'g Tr. 153, May 9, 2017.).

Nikkisha Griffin ("Griffin"), a female, was in the driver's seat of the red vehicle, and Green was seated in the passenger's seat. (Hr'g Tr. 153, May 9, 2017.) Deputy Ball saw that Green had his hands behind his back. (Hr'g Tr. 154, May 9, 2017.) Deputy Ball removed his weapon from the holster. (Hr'g Tr. 154, May 9.). Deputy Ball then had Green exit the vehicle, after Deputy Warren placed handcuffs on him. (Hr'g Tr. 154, May 9, 2017.) Deputy Warren discovered some crack cocaine in the back of Green's pants. (Hr'g Tr. 155, 167, May 9, 2017.)

Deputy Lambert was involved with Defendant while Deputy Lewis was escorting Darius Thomas ("Thomas") out of the passenger area of Defendant's vehicle. (Hr'g Tr. 155-156, 167, May 9, 2017.) Deputy Lewis found crack cocaine on Thomas' person. (Hr'g Tr. 156, 167, May 9, 2017.) Thomas ran from Deputy Lewis. (Hr'g Tr. 156, May 9, 2017.)

Deputy Ball stayed with Green, Griffin, and Defendant while Officers Lewis, Warren, and Lambert chased Thomas. (Hr'g Tr. 157-158, May 9, 2017.) Defendant was in handcuffs because he had been arrested for driving while license revoked.[2] (Hr'g Tr. 158, 166, May 9, 2017) After Thomas was apprehended, each of the officers returned to the parking lot. (Hr'g Tr. 158-159, May 9, 2017)

Deputy Ball asked Defendant to stand up, and Deputy Ball conducted a search of Defendant. (Hr'g Tr. 160, May 9, 2017.) Deputy Ball knew Defendant had been patted down by Deputy Lambert. (Hr'g Tr. 177-179, May 9, 2017.) Deputy Ball discovered a large amount of

---

[2] The Government introduced into evidence a copy of a Magistrate's Order charging Defendant with driving while license revoked and an additional charge of possession of drug paraphernalia. (Hr'g Tr. 186-188, May 9, 2017; Gov.'s Ex. 12.)

cash in one pocket of Defendant's pants and an item in Defendant's crotch area that he believed to be crack cocaine. (Hr'g Tr. 160, 181, 185, May 9, 2017.) Deputy Ball informed Defendant that his driver's license was suspended and revoked, and Defendant responded that his license should not be revoked. (Hr'g Tr. 160, May 9, 2017.) Deputy Ball asked Defendant what he had, and Defendant responded that it was "weed," which is more commonly known as marijuana. (Hr'g Tr. 162-163, May 9, 2017.) Defendant then admitted to Deputy Ball that he had "crack," also known as crack cocaine. (Hr'g Tr. 162-64, May 9, 2017).

Deputies Ball and Lambert took Defendant into the bathroom of the Crossroads Grocery Store to conduct a further search of his crotch area. (Hr'g Tr. 164-65, May 9, 2017.) In a pouch located in the crotch area of Defendant's underwear, the deputies found what was believed to be about two ounces of crack cocaine. (Hr'g Tr. 165-66, 182, May 9, 2017.) Deputy Ball explained that the search of Defendant in the bathroom was for the purpose of retrieving the items found during the search made of Defendant incident to his lawful arrest for driving while license revoked or suspended. (Hr'g Tr. 188-89, May 9, 2017.) Deputy Ball later searched Defendant's vehicle and found a set of digital scales. (Hr'g Tr. 167, May 9, 2017.)

Deputy Ball testified that he searched Defendant after Deputy Lambert had frisked him because Defendant had been arrested for driving while license suspended or revoked; thus, he was subject to a search incident to lawful arrest. (Hr'g Tr. 188-89, May 9, 2017.) Deputy Ball searched Defendant because Deputy Ball did not know how well Deputy Lambert had frisked Defendant during Deputy Lambert's first encounter with Defendant. (Hr'g Tr. 178-81, 189, May 9, 2017.) Deputy Ball admitted he did not, at any time, advise Defendant of his <u>Miranda</u> rights.[3] (Hr'g Tr. 177, May 9, 2017.)

---

[3] The Government introduced into evidence a video of the body camera footage taken by Deputy Ball during the above-described events. (Hr'g Tr. 169, May 9, 2017; Gov.'s Ex. 10.)

**B. Defendant's Evidence**

**1. Natasha Fullwood.**

Natasha Fullwood ("Fullwood"), Defendant's mother, identified Defendant's Exhibit 1 as a copy of Defendant's driving record, which Defendant gave to her in April of 2016 (Hr'g Tr. 190-92, May 9, 2017; Def.'s Ex. 1.) Fullwood was expected to hold this document for Defendant. (Hr'g Tr. 192, May 9, 2017.) Fullwood testified that Defendant's residence and mailing address in July of 2016 and September of 2016 was 57 Riverview Drive, Asheville, North Carolina 28806. (Hr'g Tr. 194, May 9, 2017.)

**2. Katimah Griffin**

Katimah Griffin ("Griffin"), Defendant's older sister, testified that in the early part of 2016, she was in at the Buncombe County Courthouse regarding a traffic charge. (Hr'g Tr. 198-99, May 9, 2017.) While Griffin was in court, she saw Defendant in the courtroom and witnessed him speak to attorney Keith Hanson ("Hanson"). (Hr'g Tr. 199-200, May 9, 2017.) Griffin then saw Defendant sit down, and Hanson went to a desk where the District Attorney was seated. (Hr'g Tr. 201, May 9, 2017.) Defendant went to the desk, had a conversation with the District Attorney, and walked around like he was happy because something had happened in his favor. (Hr'g Tr. 201, May 9, 2017.) Griffin then saw Defendant at the cashier window of the Buncombe County Clerk's Office with money in his hand. (Hr'g Tr. 202-03, May 9, 2017.) Defendant told Griffin that he was going to pay a ticket, and his license would be "straight." (Hr'g Tr. 203, May 9, 2017.)

**3. Emerald Sams**

Emerald Sams ("Sams"), Defendant's wife, testified that she obtained Defendant's driving record from the North Carolina DMV on April 11, 2017. (Hr'g Tr. 214, 216-222, May 9, 2017;

Def.'s Ex. 2.) In Sams' opinion, Defendant's driving record shows that his driver's license has never been suspended. (Hr'g Tr. 218, May 9, 2017.)

### 4. Additional Evidence

On July 5, 2017, at the request of Defendant and with the Government's consent, the undersigned conducted an additional evidentiary hearing in this matter. During that hearing, Defendant submitted a letter from the North Carolina Department of Transportation, dated June 7, 2017. (Hr'g Tr. 7, May 9, 2017; Def.'s Ex. 3.) The letter states that a review of Defendant's driving record does not indicate his driver's license was suspended on September 21, 2016, although the records may have indicated otherwise at the time. (Hr'g Tr. 7, May 9, 2017; Def.'s Ex. 3.)

The Government introduced a letter from Mary Price ("Price"), the same person at the Department of Transportation with whom Defendant had communicated. (Hr'g Tr. 6-7, May 9, 2017; Gov.'s Ex. 13.) Price's letter states that Defendant's driving privileges were indefinitely suspended on July 30, 2016, and again on September 9, 2016, based on Defendant's failure to comply with the traffic citations issued in February of 2016, in Buncombe County Case Numbers 16-CR-701517, 16-CR-701540 and 16-CR-691850.[4] (Hr'g Tr. 5, May 9, 2017; Gov.'s Ex. 13.)

## III. Discussion

### A. Legal Standards

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; United States v. Kimble, 855 F.3d 604, 610 (4th Cir. 2017). "A traffic stop constitutes a 'seizure' under the Fourth Ament and is subject to review for reasonableness." United States v. Hill, 852

---

[4] Case number 16-CR-701517 is not referenced in any of the exhibits.

F.3d 377, 381-83 (4th Cir. 2017). The Fourth Amendment's protections also extend to brief investigatory stops of persons or vehicles that don't rise to the level of a traditional arrest. United States v. Arvizu, 534 U.S. 266, 273 (2002) (citing Terry v. Ohio, 392 U.S. 1, 9 (1968)).

In the case of a brief investigatory stop, the Fourth Amendment is satisfied if the officer's actions are supported by a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry, 392 U.S. at 30). When determining if reasonable suspicion exists, the Court must look at the "totality of the circumstances" to determine whether the detaining officer had a "particularized and objective basis" for suspecting criminal activity. United States v. Cortez, 449 U.S. 411, 417-18 (1981). The Court's inquiry "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time," not on what that specific officer thought or anticipated at the time. Maryland v. Macon, 472 U.S. 463, 470-71 (1985) (citation omitted).

When a traffic stop is extended beyond the time period that the officer is completing tasks related to the traffic stop, the officer must either obtain consent from the detained individual or identify reasonable suspicion of criminal activity to support the extension of time. United States v. Williams, 808 F.3d 238, 245-46 (4th Cir. 2015). "The maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision. Instead, the appropriate constitutional inquiry is whether the detention lasted longer than was necessary, given its purpose." United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008).

A routine traffic stop is more akin to a brief Terry stop than an arrest. Rodriquez v. United States, 135 S. Ct. 1609, 1611 (2015). The duration of a routine traffic stop is determined by the goal of the seizure, which is to address the traffic violation that ultimately led to the stop and address related safety concerns. Id. While the Fourth Amendment allows certain unrelated

investigations that do not lengthen the detention, it becomes unlawful when it is prolonged in excess of the time reasonably required to complete the goal of the seizure. Id.

    **B.    The officers' actions in blocking Defendant's vehicle were justified at the inception.**

The initial question for the Court is whether the initial stop was justified. The Fourth Circuit has explained as follows:

> Under the objective test, if an officer has probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion upon the Fourth Amendment. That is so regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity:
>
>> When an officer observes a traffic offense--however minor--he has probable cause to stop the driver of the vehicle…[T]his otherwise valid stop does not become unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity…[T]hat stop remains valid even if the officer would have ignored the traffic violation but for his other suspicions.
>
> Cummins, 920 F.2d at 500-01; *see also* Trigg, 878 F.2d at 1041 ("so long as the police are doing no more than they are legally permitted and objectively authorized to do, an arrest is constitutional." (citing Causey, 834 F.2d at 1184)). Such an approach minimizes inquiry into a police officer's state of mind.
>
> We adopt the objective test and likewise hold that when an officer observes a traffic offense or other unlawful conduct, he or she is justified in stopping the vehicle under the Fourth Amendment. Such a limited detention does not become "unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity." Cummings, 920 F.2d at 499-501 (noting that the officer testified he probably would not have stopped the car if the defendant and his passenger had not continued glancing at him and behaving suspiciously).

13

United States v. Hassan El, 5 F.3d 726, 730 (4th Cir. 1993).

In this case, the evidence shows that law enforcement's actions to block the white vehicle Defendant was operating were substantially justified. Detective Hendricks, while watching a residence thought to be associated with drug activity, saw Defendant drive a white sedan into the parking lot of the Crossroads Grocery Store. (Hr'g Tr. 120-21, May 9, 2017.) Detective Hendricks determined that Defendant's driver's license was suspended. (T. p. 124) North Carolina General Statute § 20-28 provides as follows:

> (a) Driving While License Revoked.---Except as provided in subsections (a1) or (a2) of this section, any person whose drivers license has been revoked who drives any motor vehicle upon the highways of the State while the license is revoked is guilty of a Class 3 misdemeanor.

The evidence shows that Defendant had operated a vehicle with a revoked license in the presence of Detective Hendricks. (Hr'g Tr. 120-21, May 9, 2017.) Thus, at that time, the law enforcement officers had probable cause to believe that a traffic violation had occurred. See Whren v. United States, 517 U.S. 806 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). In sum, there was probable cause to believe Defendant had committed a traffic violation. Consequently, the stop of the white vehicle Defendant was operating was lawful.

**C. The officers' actions were reasonably related in scope to the circumstances that justified the stop.**

Prior to the stop, Deputy Ball had already completed a computer check, which showed Defendant was driving a vehicle while his driver's license was suspended. (Hr'g Tr. 151, May 9, 2017.) Defendant was arrested for the crime of driving while license

revoked shortly after he was removed from the vehicle. (Hr'g Tr. 155, 166, 179-81, May 9, 2017.)

There was no delay other than that caused by the acts of flight of Thomas, and even that delay was a <u>de minimus</u>. The actions of Deputies Ball, Lambert, and Warren were reasonably related in scope to the circumstances of the stop. Therefore, the actions of the officers were reasonably related in scope to the circumstances justifying the stop.

### D. The search incident to a lawful arrest

When a search by law enforcement is being conducted to discover evidence of criminal wrongdoing, the Fourth Amendment generally requires a search warrant. <u>Riley v. California</u>, 134 S. Ct. 2473, 2482 (2014). A search incident to a lawful arrest is a well-settled exception to this general rule. <u>United States v. Currence</u>, 446 F.3d 554, 556 (4th Cir. 2006). Pursuant to this exception, law enforcement can search an arrestee's person and the area within his immediate control. <u>Id.</u>

In this case, the search of Defendant took place at the time of his arrest and then again shortly thereafter. Deputy Lambert arrested Defendant, secured him in handcuffs, and conducted a brief frisk. (Hr'g Tr. 179-80, May 9, 2017.) Deputy Lambert was then called away when Thomas tried to escape. (Hr'g Tr. 180, May 9, 2017.) After the other deputies returned, Deputy Ball conducted another search of Defendant because he did not have an idea of how well Deputy Lambert had checked Defendant. (Hr'g Tr. 180, May 9, 2017.) It was during Deputy Ball's additional search that crack cocaine was discovered near Defendant's private parts. (Hr'g Tr. 181, May 9, 2017.) Defendant was taken into the bathroom of the Crossroads Grocery Store and crack cocaine was discovered, which had been placed in a pocket sewn into the front of his boxer shorts. (Hr'g Tr. 181-82, May 9,

15

2017.)  A search was conducted both at the time of Defendant's arrest and later covered areas within his immediate control that included Defendant's boxer briefs and the private areas of his body.

Defendant argues that his driver's license was not suspended on September 21, 2016, and as a result, he could not been lawfully arrested for driving while license suspended or revoked.  Def.'s Br. (# 9) at 5.  Defendant further argues that the items found on his body should be suppressed and secluded from evidence.  Id. at 5-9.

A review of the exhibits introduced and the testimony presented reveals that Defendant's driver's license was suspended on September 21, 2016.  Government's Exhibits 1, 2 and 3 establish that Defendant did not appear in court as he was required to do pursuant to those citations. Defendant was notified by the DMV, in a letters dated May 31, 2016, that his driver's license would be suspended on July 30, 2016 for the charge in Government's Exhibits 1 and 2.  (Gov.'s Exs. 5, 6.)  Defendant was also sent a letter by the North Carolina DMV, on July 11, 2016, which informed him that his driver's license would be revoked on September 9, 2016, for his failure to appear on the charge in Government's Exhibit 3. (Gov.'s Ex. 7.)

It was only after the date of Defendant's arrest in this matter that Defendant made efforts to obtain a restoration of his driving privileges. (Def.'s Ex. 3; Gov.'s Ex. 13.) Defendant was ultimately successful in obtaining a restoration of his driver's license, but this effort does not alter the fact that his driver's license was in a state of suspension on September 21, 2016.  If Defendant operated a motor vehicle in North Carolina upon a street, highway, or public vehicular area, he could be arrested and charged with the offense

of driving while license suspended or revoked. Therefore, the undersigned will recommend that Defendant's Motion to Suppress the results of his search be denied.

E. **Defendant's Statements**

The evidence in this case shows that while Deputy Ball was searching Defendant, Deputy Ball asked Defendant questions, and he responded. (Hr'g Tr. 162-164, May 9, 2017.) In particular, Deputy Ball asked Defendant what the substance was in his boxer briefs, and Defendant responded that it was "weed." (Hr'g Tr. 162, 163, May 9, 2017.) When Deputy Ball asked further questions of Defendant concerning what the substance was, Defendant eventually admitted that it was "crack." (Hr'g Tr. 163-64, May 9, 2017.) At the time that these questions were posed to Defendant, he was restrained in handcuffs. (Hr'g Tr. 166, May 9, 2017.) Because Defendant was handcuffed, he was, without a doubt, in custody. See Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (holding that the test for assessing whether an individual is "in custody" for Miranda purposes is whether, under the totality of the circumstances, the individual's freedom of action is curtailed to the degree associated with a formal arrest).

In this case, law enforcement did not advise Defendant of his rights as required by Miranda v. Arizona, 384 U.S. 436 (1966). Unless an exception applies, Defendant's answers to Deputy Ball's questions must be suppressed. The Government argues that the "public safety exception," established by the United States Supreme Court in New York v. Quarles, 467 U.S. 649 (1984), is applicable to this case. Gov.'s Br. (# 14) at 23.

As a general rule, Miranda warnings must be given before an individual "in custody" can be interrogated. Miranda v. Arizona, 384 U.S. 436 (1966). An exception to the general rule is the "public safety exception," which permits pre-Miranda questioning

at the scene of an arrest regarding weapons, drug use, or other matters relevant to the safety of officers or the public. New York v. Quarles, 467 U.S. 649, 655-56 (1984).

Based on the facts presented to Deputy Ball at the time he questioned Defendant, the undersigned finds this was not a situation that raised an issue of safety for the officers or members of the public. In particular, Defendant was restrained in handcuffs and under arrest. (Hr'g Tr. 166, May 9, 2017.) All of the other persons who had created interest for the officers had been apprehended. (Hr'g Tr. 159-60, May 9, 2017.) No weapons were found on Defendant or in the vehicle he was operating. (Hr'g Tr. 167-68, May 9, 2017.) As a result, the Court concludes that the public safety exception does not apply in this case. Therefore, the undersigned will recommend that Defendant's Motion to Suppress his statements in response to Deputy Ball's questions be granted.

**IV.     Conclusion.**

The Court RECOMMENDS that the District Court Deny in Part and Grant in Part Defendant's Motion to Suppress (# 9.) In particular, the Court RECOMMENDS that the District Court Deny Defendant's Motion to Suppress the evidence found on Defendant's body as a result of the search and Grant Defendant's Motion to Suppress his responses to the pre-Miranda questions from Deputy Ball.

Signed: November 17, 2017

Dennis L. Howell
United States Magistrate Judge

## **Time for Objections**

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(C), and Federal Rule of Civil Procedure 72, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14) days** of service of same. Responses to the objections must be filed within **fourteen (14) days** of service of the objections. Failure to file objections to this Memorandum and Recommendation with the District Court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).